# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# WESTERN DIVISION

LONNIE D. MORRIS,

    Petitioner,

v.

UNITED STATES OF AMERICA,

    Respondent.

No. 10 C 50239
(06 CR 50007)
Judge James B. Zagel

## MEMORANDUM OPINION AND ORDER

Lonnie D. Morris seeks relief under § 2255. He was charged (in 2006) with three related offenses: possession with intent to distribute 23.7 grams of heroin, being a felon in possession of a firearm and possessing a firearm in furtherance of a drug trafficking offense. He was convicted of all three counts after trial by jury. In accordance with the law he received a stiff sentence–240 months concurrent for the drug related offenses and a consecutive 60 months for the felon in possession count, amounting to 25 years in prison. He appealed and judgment was affirmed. *United States v. Morris,* 576 F.3d 661 (7th Cir. 2009). His petition for post-conviction relief is timely.

Morris challenges various aspects of his sentence, but the key point for him is his claim of ineffective assistance of counsel. He was represented by retained counsel, an experienced and well-regarded criminal defense lawyer. Nevertheless, lawyers and similarly experienced and well-regarded judges make mistakes that they should not have made. To see if this happened here, I set forth the facts drawn from the record and the opinion of the Court of Appeals.

## I. BACKGROUND

The case began with a single family house on Albert Avenue in Rockford, a place suspected of being a drug trafficking locus. The lead officer of the investigation, Detective Rich Gambini of the Rockford, Illinois police, arranged for pick up of trash bags placed for collection in front of the Albert house. The search of the trash uncovered 286 empty plastic baggies with the corners cut off, two empty Dormin sleeping pill containers and 49 empty Dormin capsules. Dormin, a sleeping powder, is commonly used to cut heroin before the drug is sold.

From May 22, 2005 until June 2, 2005, Det. Gambini watched the house one or two times a day. On occasions, he observed Morris at the location.

On June 2nd, Gambini seized three more trash bags abandoned in front of the house. They found about 300 more cut baggies and evidence of Dormin use. The police also found papers addressed to Morris at the house and other documents addressed to Morris's wife at that address.

Late that same day - in anticipation of executing a search warrant - Gambini watched the house and surrounding area again. He saw a maroon car some distance from the house. It was a car Gambini knew was frequently driven by Morris. Morris's ex-wife had confirmed at least his occasional use of the auto. The detective observed the vehicle parked in the lot of a local liquor store. Morris was alone in the car as Gambini watched. Gambini saw a black male come to the car and lean into the vehicle at the driver's side window. There appeared to be a brief conversation and then a hand-to-hand exchange of objects the nature of which could not be determined from where Gambini was located. After this Morris drove off. Gambini followed.

Morris stopped next at an intersection where another black male leaned into the car. An exchange similar to the one in the liquor store took place. After the second exchange, Morris

drove back to the Albert Avenue house and pulled into the driveway. He remained in the car. Yet another black male drove up, stopped, and exited his car. He, too, walked to Morris's car, leaned in, and made a hand-to-hand exchange. After this Morris left the car and entered the house through a north door.

Seeing this, Gambini called in the team to execute the warrant. The team arrived, knocked and announced and, getting no response, entered the back (east) door by force. There was a woman and four children on the front porch. A police officer guarded the front door.

Gambini, now inside the house, heard the sound of footsteps running up a flight of stairs emerging from the basement. Gambini ordered him to stop. The person (who was Morris) looked at Gambini and then ran outside through the front door. The officer at the front door chased Morris and tackled him. Morris had $163 in his pocket.

During the search of the basement Gambini found a cell phone, a razor blade, a digital scale and two plastic baggies on top of a dryer. Behind a mattress leaning on a wall, he found a one gallon ziplock bag containing powder which was found later to be 23.6 grams of heroin.

Gambini then searched the car used by Petitioner and found two small baggies in the handle well. These two contained heroin and another baggie held 4 Dormin capsules like those previously found in the trash. In the driver's side door compartment, the detective found a loaded .22 handgun lodged beneath a paper with Morris' name on it.

In the garage, Gambini discovered a Lincoln Town Car registered to Donte Webb. Gambini found another auto, a Pontiac Grand Prix, also inside the garage. The Lincoln's trunk was partially open and, using a flashlight, Gambini saw three large plastic bags with stacks of cash inside. Later a fingerprint on one of the bags was identified as belonging to Morris.

Gambini also saw a large gun in the trunk which was then opened, and the money and firearm seized. The cash counted out at $4920. The weapon was a .30 caliber rifle with ammunition for it contained in a box.

The Town Car was locked. Gambini looked inside the house and found a key on a distinctive key chain with the name "Scott." It worked to open the Town Car where he found a public aid document with Morris's name on it. The trunk of the Grand Prix was open and in it he saw two bulletproof vests.

On the trip to jail, Morris told Gambini that "this case is dropped. You had no probable cause to get in my house."

Four days later, on June 6, Gambini saw Morris driving a Mercury Sable and not wearing a seat belt. This lead to another stop. Gambini eventually saw the distinctive key chain with the name "Scott" in the passenger compartment of the Sable. Morris told Gambini that he had never seen the key chain before.

A few months passed while a grand jury was proceeding. Donte Webb, who is Morris's cousin, received a subpoena to testify at the grand jury. Webb then called Morris to tell him about the subpoena. The two met and Morris told Webb about the police raid and that drugs were found in the house and a gun in the car. Morris said he used Webb's identification to purchase a car and told Webb to tell the police that the cars at Albert Avenue were Webb's cars, stored there while Webb was incarcerated.

Metro Narcotics Sergeant Marc Welsh testified as an expert to establish the following: (1) dealers generally buy an ounce of heroin and divide it in small packets; (2) in June 2005 an ounce sold for $3000 and retail price for .05 gram sold for $5 and .1 gram brought $10 (3) dealers dilute

4

heroin by putting it on a scale, dividing it into small doses with a razor blade, adding something like Dormin to each smaller unit and bagging the small portion in baggies or foil for sale (4) the bag of heroin found at Albert Avenue was consistent in appearance with uncut heroin and the substance found in the small packets was consistent with the appearance of heroin diluted with Dormin (5) cut corners on baggies are consistent with packaging used to sell street level doses (6) street level dealers usually have cash in small denominations–singles up to twenties and (6) drug dealers use firearms to protect their stock in trade and cash from rival drug dealers.

## II. DISCUSSION

*Ineffective Assistance of Counsel*

Morris argues that his counsel was constitutionally ineffective when he failed to interview a potential rebuttal witness. This putative witness, Leslie Stamper, Jr., executed an affidavit stating that he had come to the Albert Avenue house in a Monte Carlo with a friend in the passenger seat. He avers that Morris and he walked into the street near the rear of his car to discuss "me bringing him a Chevy Lumina for him to drive." This occurred "right before" the house was raided.

Stamper says he made several attempts to reach defense counsel to tell defense counsel of these events but defense counsel never returned a call. The affidavit was executed after verdict but before sentencing. I infer from the statement that the investigating detective knew that Morris and Stamper were associated in some way.

There is no reasonable probability that, with Stamper's testimony, the result would have been different. *See Pole v. Randolph,* 570 F.3d 922, 936 (7th Cir. 2009).

Stamper had prior convictions in state court for unlawful use of weapons and making or delivering heroin. What he says in his affidavit does not exonerate Morris or specifically contradict Detective Gambini's testimony. What the jury would see is a defense witness who was involved with firearms and heroin offenses like those charged against Morris and not worthy of belief.[1]

Stamper's affidavit is not helpful to Morris. In his affidavit he gives details that corroborate the detective's description of Stamper's car and its presence at the scene. He gives details about precisely where he and Morris had a conversation. He *never* denies having made a hand-to-hand exchange of something with Morris. He does not even deny having had hand-to-hand contact with Morris that a police officer could reasonably believe, in the circumstances here, was an exchange rather than a handshake. Offering testimony that it was Stamper who drove the Monte Carlo and that he had a passenger with him was of marginal value to Morris's defense. When considered in the context of what Stamper did not say, it would have been unhelpful to Morris even without the circumstance of Stamper's own convictions to impeach his credibility.

The second aspect of the ineffectiveness claim is that defense counsel failed to instruct his own investigator to interview Detective Gambini prior to trial so that the investigator's testimony (which was offered) refuting the detective's description of his pre-raid surveillance would have been more persuasive. The argument depends on assumptions as opposed to evidence. It assumes the detective would be willing to be interviewed by the defense

---

[1]While I am discussing prejudice here, I note that the facts of Stamper's convictions alone would cause a reasonable defense counsel to refrain from calling Stamper even if Stamper had some helpful testimony to offer.

investigator. There is nothing to support the assumption - the contrary, in all likelihood the detective would have declined the interview. In any event, the investigator had the detective's police reports and his testimony in the motion to suppress. Proof of prejudice cannot be made on this basis.

*Ineffective Assistance - Failure to Raise Restoration of Rights Issue on Firearms Charges*

In *Buchmeir v.United States,* 581 F.3d 561 (7th Cir. 2009) the Court of Appeals held that some firearm convictions may not be counted for armed career criminal guideline purposes where the defendant reasonably believed his right to possess a firearm was restored. In fact, the right to possess a firearm is not restored under Illinois law or federal law for that matter. The Illinois Department of Corrections was, for a time, issuing letters to former prisoners indicating that their right were restored and did so in language that might mislead them to believe that firearm rights were restored. A former prisoner might act on that assumption although to do so would violate the state law that requires issuance of a FOID card as a prerequisite to possessing a firearm. Morris alleges that he had such letters (although he is not too clear about when he got them) and his lawyer should have asked him about them. The lawyer may reasonably have failed to do so because the rule in *Buchmeir* was not clearly enunciated until months after Morris was sentenced.

In the end, none of this is material to this case because Morris's guideline was not established under Armed Career Criminal enhancement. Rather, it was established under traditional "Career Offender" provisions. There were more than enough prior felony convictions for the latter enhancement to apply. Morris has overlooked the distinction between

7

the two enhancements and therefore his reliance on any restoration of rights letters is ultimately irrelevant.

*Improper Imposition of the Consecutive Sentence*

The 60-month consecutive sentence for being a felon in possession of a firearm was proper. *See Abbott v. United States*, 131 S. Ct. 18 (2010). Even if it were not proper, the claim is not constitutional in dimension. It could have been raised on appeal, but was not. It is therefore waived here.

*Petitioner's Motion to Amend.*

On April 18, 2012 - over one and a half years after his original petition - Morris sought leave to expand the legal grounds of his petition to include a claim of factual innocence as a free standing ground for relief. Though titled as a motion for leave to "amend" his present petition, I interpret it as a motion for leave to file a second or successive petition. Therefore, Petitioner must make the appropriate motion in the Court of Appeals under 28 U.S.C. §§ 2244 and 2255. The motion in this court must be denied.

## III. CONCLUSION

For the reasons stated above, Lonnie D. Morris's § 2255 petition and his motion for leave to amend are DENIED.

ENTER:

_____
James B. Zagel
United States District Judge

DATE: June 22, 2012